# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF MASSACHUSETTS
# EASTERN DIVISION

| | |
|---|---|
| In re<br><br>BRIAN MCPHERSON,<br><br>　　　　　　　　　　Debtor<br><br>ANDREW LEVITSKY and<br>HYESEON LEVITSKY,<br><br>　　　　　　　　　　Plaintiffs<br><br>v.<br><br>BRIAN MCPHERSON,<br><br>　　　　　　　　　　Defendant | Chapter 13<br>Case No. 14-10932-FJB<br><br><br><br><br>Adversary Proceeding<br>No. 14-1218 |

## MEMORANDUM OF DECISION

Plaintiffs Andrew and Hyeson Levitsky (collectively "the Levitskys") live in Needham, Massachusetts. In 2010, they decided to put an addition on their home. While the renovation began as a modest one, eventually it became an extensive project, including a family room and garage with a master suite and additional room over the garage. They entered a construction agreement (the "Construction Agreement") with the debtor, Brian McPherson (the "Debtor"), as a contractor. The construction project went badly, and the Debtor was terminated before the construction was complete. An arbitration proceeding ensued that resulted in a state court judgment against the Debtor in the amount of $149,515.54. The Debtor then filed a petition for relief under chapter 13 of the Bankruptcy Code. In the bankruptcy case thereby commenced, he has obtained confirmation of a chapter 13 plan and then two amended plans. He has been paying the amounts required by these plans. Provided he continues to do so, his current plan will result in payment of approximately 6.75 percent of the

Levitskys' judgment over five years. Upon completion of the plan and proper application to the Court, the Debtor may then obtain a discharge under 11 U.S.C. § 1328(a).

The Levitskys have now filed an adversary proceeding against the Debtor, seeking a determination that the unpaid balance of their state court judgment against him is excepted from discharge under 11 U.S.C. § 523(a)(2)(A), (a)(4), and (a)(6). After a trial that included the testimony of Andrew Levitsky and the Debtor—Mrs. Levitsky was in the courtroom but did not testify—and the admission of well over one hundred exhibits, I find that the Levitskys have failed to carry their burden of establishing nondischargeability under the relevant sections of the Bankruptcy Code. The following constitute my findings of fact and conclusions of law in the matter.

**The Facts**

Before the Debtor filed his bankruptcy petition, the parties engaged in a full arbitration proceeding, as was mandatory under their Construction Agreement. The arbitrator eventually issued an arbitration award that determined the Levitskys to be the prevailing party, which award was confirmed by a state court of competent jurisdiction. In the award, the arbitrator made certain factual findings, and the parties have stipulated that the findings are binding in this proceeding. The arbitration award was admitted at trial. Because the parties agreed that those findings are essentially stipulations, I summarize them here:

1. The parties entered a construction contract dated May 29, 2010 for the renovation of the Levitsky home in Needham, Massachusetts. The agreed contract price was $307,100, including architectural design. On August 16, 2010 the parties agreed to a change order whereby additional work was added for a cost of $62,000 (the "First Change Order"), for a total contract price of $369,100. The parties also agreed to additional construction work after August 16, 2010.

2. The Construction Agreement stated that the "project completion date shall be approximately 147 days from the first date of construction, however, any change order and/or unusual weather might delay or otherwise affect the completion date."

3. Construction started on November 1, 2010, and was still not substantially completed on March 29, 2012, when the Levitskys terminated the Debtor. The Debtor never requested any extensions of time to complete the project, and none were given. The Levitskys

2

    were justified in terminating the Debtor on March 29, 2012 because the Debtor should have completed the project, including all change orders and additions, "several months before the termination date." The Debtor failed to perform his work on time and in accordance with the Construction Agreement.

4. The Levitskys obtained a construction loan from a bank. Payments were to be advanced when certain progress milestones were made on the project, and payments were to be advanced from the bank to Debtor after inspection and approval by the bank's agent. The Construction Agreement included an addendum dated May 21, 2010 that added a provision as follows: "since the bank will be making the progress payments to [the Debtor], there should not be any penalty to [the Levitskys] for slow payments." Based on this provision, the arbitrator found that Debtor could not complain of slow payments from the bank as an excuse for delay.

5. The Levitskys wrote checks totaling $48,000 to the Debtor as advances on the work under the Construction Agreement because he "demanded that they do so." When the bank paid the Debtor for the work covered by the advances, he was to repay the Levitskys so as not to be paid twice. The Debtor provided repayment checks to the Levitskys, but two of those checks were dishonored, and others were held by the Levitskys for fear they would be dishonored. This left a balance due to the Levitskys of $43,000 for unmade reimbursements.

6. The Levitskys received an arbitration award for breach of the Construction Agreement—including sums for some 18 items collectively labeled "cost to complete and repair work and consequentials," plus four items for "credits admitted by [the Debtor]"—and the Debtor received an offset award for unjust enrichment for work he did to improve the house but for which he was not paid. The net award for breach of contract to the Levitskys was $78,957.48, plus 12% interest until paid. The Levitskys also received an award for $200 in statutory damages for two dishonored checks. And the Levitskys received an award of "reasonable attorney fees" and costs as the prevailing party under the arbitration clause in the Construction Agreement. The total of such fees and costs was $55,234.54.

The parties agree that the arbitrator did not make a finding of any alleged fraud or statutory business torts, other than the statutory tort for dishonoring two checks.

    The arbitrator's findings did not specifically address certain other aspects of the deal between the parties. In addition to the change order stated in the addendum, the Levitskys also requested additional work totaling $79,000 (the "Additional Work"). Those additions were detailed on a sheet prepared by the Levitskys entitled "Approved Change Orders." According to the sheet, of the $79,000 in additional work, all but $27,500 was completed.

The Construction Agreement anticipated the need for changes and additions to the scope of the work. In fact, the First Change Order and the Additional Work were added to the scope of the project. Article 9.1 of the Construction Agreement provided in part as follows:

> A Change Order is any change to the original plans and/or specifications. All change orders need to be agreed upon in writing, . . . 50% of the cost of each change order will be paid prior to the change, with the final 50% paid upon completion of the change order. . . [a]dditional time needed to complete change orders shall be taken into consideration in the project completion date.

Despite the First Change Order and "Additional Work," there was no evidence that the process set forth at Article 9.1 was followed. In fact, the changes and additions were not reduced to writing, and no 50% advance payment to the Debtor was ever made.

The financing of the project was through the bank loan secured by a mortgage in the amount of $369,100, which matched the amount of the Construction Agreement and the First Change Order. The arrangement was for the Debtor to complete a phase of the project and to send a requisition, signed by the Levitskys, to the bank. The bank was then required to have its agent inspect the work, approve it, and authorize a wire payment to the Debtor within seven days of the requisition. The construction loan did not include the amount needed for the Additional Work of $79,000. That amount was to be paid directly from the Levitskys. So, part of the work was to be paid to the Debtor by the bank, and the other part of the work was to be paid for directly by the Levitskys.

The project was severely delayed, but the reasons for the delays are the subject of much dispute. The Construction Agreement required completion in 147 days, but the project remained incomplete after 511 days. The Construction Agreement required at Article 5.1 that the Levitskys would make progress payments to the Debtor within seven days of receiving a requisition. Section 5.2 of the agreement permitted the Debtor to cease all work if a progress payment was not made within fourteen days of requisition, in other words if it was a week late. After the loan was arranged, the Construction Agreement, paragraph 5, was amended to state that because the payments were to be made by the

4

bank, the Levitskys should suffer "no penalty" by the bank's failure to make timely payments. The Debtor initialed the amendment and wrote "No Penalty" next to this change. Indeed, it was on the basis of that amendment that the arbitrator denied the Debtor the ability to offer the bank's late payments as a defense to breach of contract for his delay in completing the project on time. The Debtor testified, however, that he understood this to mean that he could not charge the Levitskys a penalty for any delays. He did not understand the words "no penalty" to mean that he could not argue that the bank's delay in making payment was the cause of the delay on the project.

Mr. Levitsky testified that the Debtor repeatedly told him that the bank was slow in making its required payments and that the town was slow to issue the required permits. The Debtor submitted 20 requisition requests to the bank. Each requisition was signed by the Levitskys. Mr. Levitsky created a chalk that compared the date of each requisition to the actual date of the payment. The chalk showed that on average the requisitions were paid after nine days rather than within the seven days required under the Construction Agreement. On cross examination Mr. Levitsky admitted that some payments were as late as twenty-two days. On three occasions the payments were more than fourteen days late providing the Debtor with a contractual right to stop all work or to terminate the agreement, which he did not do. The Debtor testified that he needed the cash from the requisitions in order to purchase materials and pay subcontractors. When he did not get the payments, he had to delay or stop the work.

The Levitskys offered evidence that the Debtor told them in August and September 2011 that the town was slow in issuing a building permit on the Additional Work. The building permit itself is in evidence, and it is dated August 14, 2011. There are also emails on September 13 and 16 from the Debtor to the Levitskys stating that the permit was "on someone's desk" at the town hall. There is no evidence of when the Debtor actually received the signed permit.

The Debtor testified that the project was delayed because the Levitskys, particularly Mrs. Levitsky, made many changes to the scope of the work. The Debtor introduced a series of emails

5

wherein the parties discussed changes to the scope of the work. He testified in great detail about how the changes delayed the progress of the project. In May of 2011 Mrs. Levitsky complained that she did not have sufficient details on the progress of the work. In response the Debtor identified the additions made beyond the original contract and the First Change Order: a renovated basement, radiant heat, exterior siding and roof, painting the exterior, a front walk, a furnace upgrade, blown-in insulation, a balcony overhang, smoke detectors in the original structure, a rear deck, an additional bath tub, tree removal, exterior stone work, and built-in cabinets. The changes added nearly $190,000 to the cost of the project. In a responding email, Mr. Levitsky did not dispute that the additions had been requested, but he withdrew several items: the stone work, rear deck, blown-in insulation, and front door. Mr. Levitsky stated that "we wish we had more $$ to spend, but we are maxed out." The cost of the Additional Work was $120,500. Later, Mrs. Levitsky asked the Debtor to resume the stone work at a cost of $47,700, but she did not agree to provide additional funds for that work. According to the Debtor, this behavior caused confusion and delay. I find the Debtor credible in his description of these events.

     The Debtor testified about the reason for the checks totaling $48,000 from the Debtor to the Levitskys. When the bank was slow to pay the Debtor, he was required to stop or delay work. Mrs. Levitsky came up with an approach to keep the work going. She advanced the delayed funds to the Debtor, and he provided checks back to the Levitskys for them to "hold" until the Debtor was paid by the bank on outstanding requisitions. The Levitskys agreed not to deposit the checks, according to the Debtor. But it appears that the Levitskys were short of funds, so Mrs. Levitsky told the Debtor that she needed to deposit a $5,000 check of his in order to cover a dishonored mortgage payment that the Levitskys had written to their mortgage lender and to pay for their son's private school tuition. The Debtor agreed that they could deposit a $5,000 check. Later, Mrs. Levitsky deposited two other checks that the Debtor had given her but without his permission. Those two checks are the ones that were

6

dishonored. I find the Debtor credible with respect to these facts. Mrs. Levitsky did not testify to rebut the Debtor's testimony.

Mr. Levitsky testified that the Debtor engaged in a tactic of leaving parts of the project incomplete as a means of extracting additional money. Specifically, he says the Debtor failed to place all of the tiles in the bathroom floor, failed to match the siding on the addition to the existing structure, failed to match the roofs, left a large pile of soil in the yard, and left a gap in the fascia that allowed animals to enter the roof of the new structure. He claims that the Debtor "strung" him along with a variety of excuses for a failure to complete the work, none of which were true. As evidence of the Debtor's intent to use partial completion as a "lever" to extract additional money, Mr. Levitsky testified that on March 29, 2012, there was a meeting at the house at which Mr. Levitsky questioned the Debtor about "[w]hat's up with all of the incomplete things . . . [e]specially the tiles, what's going on?" He says that the Debtor responded "[w]ell that's my carrot." It was this response that caused Levitsky to terminate the Debtor. Levitsky testified that the Debtor lied when he said he did not have the tiles needed to complete the bathroom because on the day he was terminated, the tiles "magically" appeared on his doorstep within two hours, proving that the Debtor had them all along. Levitsky provided detailed testimony about a large series of construction items that were started but not completed on the project.

The Debtor testified about parts of the construction project that were not completed at the time he was terminated. For example, he testified that he did not finish the flooring in a bedroom closet, he did not complete some work on the exterior of the house, he did not add certain doors to a cabinet, and he did not remove the "dirt pile" in the yard. The Debtor testified that these items were not completed because Levitsky made changes to the scope of the work and then terminated him before he could compete the work. As to the "dirt pile," the Debtor explained that Levitsky had added construction of stone work in the yard at a cost of $47,000, but later Levitsky cancelled that addition.

7

Still, the Debtor had already begun the excavation of the yard for this work and he was terminated before he could restore it. The Debtor flatly denied that he ever said that the reason for not completing the tile work was to hold a "carrot" to compel Levitsky to pay more money to him. In fact, he testified that the tiles were expensive, that he delayed picking them up at the supplier because he had not been paid for the additional tiles. But, after he was terminated he went to the supplier, picked up the tiles and paid for them because he had committed to purchasing the tiles from the supplier. He then delivered the tiles to the Levitskys so that they could complete the bathroom floor. I find the Debtor credible on this testimony.

**Jurisdiction**

The matter before the court is a complaint under 11 U.S.C. § 523(a) to determine the dischargeability of a debt. The matter arises under the Bankruptcy Code and in a bankruptcy case and therefore falls within the jurisdiction given the district court in 28 U.S.C. § 1334(b) and, by standing order of reference, referred to the bankruptcy court pursuant to 28 U.S.C. § 157(a). It is a core proceeding. 28 U.S.C. § 157(b)(2)(I)(core proceedings include determinations as to the dischargeability of particular debts). This court accordingly has authority to enter final judgment in the matter. 28 U.S.C. § 157(b)(1).

**Analysis**

It is a fundamental rule that the party seeking to except a debt from discharge bears the burden of proving each element by a preponderance of evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991). In furtherance of the Bankruptcy Code's "fresh start" policy, exceptions to discharge are narrowly construed. *Palmacci v. Umpierrez*, 121 F.3d 781, 786 (1st Cir. 1997). I now turn to the Code sections that the Levitskys say require a determination that their claims should not be discharged.

**A.     11 U.S.C. § 523(a)(2)(A)**

   **i.     Applicable Law**

Section 523(a)(2)(A) of the Bankruptcy Code excepts from discharge any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud." 11 U.S.C. § 523(a)(2)(A). In order to establish that a debt is nondischargeable under § 523(a)(2)(A) due to a false representation, the plaintiff must prove each of the following elements by a preponderance of the evidence: "1) the debtor made a knowingly false representation or one made in reckless disregard of the truth; 2) the debtor intended to deceive; 3) the debtor intended to induce the creditor to rely upon the false statement; 4) the creditor actually relied upon the misrepresentation; 5) the creditor's reliance was justifiable; and 6) the reliance upon the false statement caused damage." *McCrory v. Spigel* (*In re Spigel*), 260 F.3d 27, 32 (1st Cir. 2001), citing *Palmacci*, 121 F.3d at 786). In the case of *Husky International Electronics, Inc. v. Ritz*, __ U.S. __, 136 S.Ct. 1581 (2016) the Supreme Court construed and clarified the phrase "actual fraud" in § 523(a)(2)(A). The Court rejected the idea that "actual fraud" can *only* be established where there is a misrepresentation. Other types of fraudulent acts can establish liability under § 523(a)(2)(A).

The first element, making a knowingly false representation, refers to the conduct of the debtor and can include a debtor's promise to act, "[i]f, at the time he made his promise, the debtor did not *intend to perform*[.]" *Palmacci*, 121 F.3d at 786-87 (emphasis in original). The second element, intent to deceive, refers to the Debtor's mental state and specifically requires a mental state embracing an intent to deceive, manipulate, or defraud. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, 96 S.Ct. 1375, 1380–81, 47 L.Ed.2d 668 (1976); *Palmacci*, 121 F.3d at 786-87. "Availability of direct evidence to prove a debtor's intent to deceive a creditor is unlikely to be obtained. The court, therefore, may infer fraudulent intent from the totality of circumstances*." Danvers Savings Bank v. Alexander (In re Alexander)*, 427 B.R. 183, 195 (Bankr. D. Mass. 2010), citing *Palmacci*, 121 F.3d at 789.

9

The final four elements embody the requirement that the creditor's claim must arise directly from the debtor's fraud. *Faria v Silva (Ire Silva)*, 2014 WL 217889 at *5, citing *McCrory*, 260 F.3d at 32. As to the creditor's reliance, the Supreme Court of the United States has held that § 523(a)(2)(A) requires only justifiable reliance—a lower standard than reasonableness. *Field v. Mans,* 516 U.S. 59, 70 (1995). Reliance is justifiable if the falsity of the representation would not have been readily apparent to the person to whom it was made. *Id.* at 70-72. Under the justifiable reliance standard, "a person is justified in relying on a representation of fact 'although he might have ascertained the falsity of the representation had he made an investigation.'" *Id.*, quoting Restatement (Second) of Torts § 540. For purposes of determining whether reliance was justified, "the circumstances of the reliance claim must be taken into account," and "the individual is not obliged to investigate statements made to him (although he cannot shut his eyes to an obvious falsehood)." *Lentz v. Spadoni* (*In re Spadoni*), 316 F.3d 56, 59 (1st Cir. 2003).

　　**ii.　　Discussion**

The Levitskys allege a series of statements by the Debtor that they say were untrue and that provide the basis for their claims under § 523(a)(2)(A). They first allege in the complaint that the Debtor promised to use a certain quality of materials, such as custom made cabinets, tile, and a sump pump, but that he used lower quality materials than promised. The Levitskys offered no evidence as to these allegations at trial, and they submitted no proposed findings or rulings about them after the trial. It appears that the Levitskys abandoned this theory by the time they got to trial.

Next the Levitskys allege that the Debtor promised that he would complete the project in 147 days, but that when he was terminated over 500 days later, the project was still incomplete. They allege that he falsely blamed the delays on the bank's slowness in paying requisitions and the town's delays in providing permits. They say that he made these false statements in order to trick the Levitskys into paying him more money that he never intended to repay and that they were injured when they in fact

10

wrote him checks totaling $43,000 that he never repaid. I reject this argument because the Levitskys failed to prove that the Debtor's statements were in fact false. The Levitskys offered a chalk, drawn from other exhibits admitted in the case, that demonstrated that on average the bank in fact failed to meet the required seven-day deadline for paying requisitions. But that is only part of the story. The bank was late by 22 days once and by 14 days twice. Those are material delays in payment. And the fact that the arbitrator found that the Debtor waived any right to complain about the bank's delays is irrelevant to the § 523(a)(2)(A) claim. The arbitrator considered this evidence on the issue of whether the Debtor had breached the Construction Agreement, and she found that he had. That has no bearing on whether the Debtor's statements blaming the bank for delaying the project were false. I specifically find that the Debtor's testimony about the bank's delays in processing the requisitions was credible and borne out by the chalk that the Levitskys offered at trial.

The Levitskys also allege that the Debtor falsely blamed the delays on the town's slowness in issuing building permits. They say that he told them by email on September 14 and 16, 2011 that "the paperwork is on the inspector's desk [at the town hall]" and on September 16 that "the permit has been approved." But, according to the Levitskys, the building permit "had been approved" on August 14, 2011, and the permit was admitted in evidence. But this evidence is insufficient to establish fraud. There is no evidence that the Debtor was aware that the building permit was approved before his statements on September 14 and 16, 2011. Nor is there evidence that his statements in September were untrue. All he said in the emails to the Levitskys was that the paperwork was on the inspector's desk, which was not proven to be false, and, later, that the permit had been approved, which was true.

The Levitskys also argue that they established fraud under § 523(a)(2)(A) because the Debtor falsely told them that he "ran out of bathroom tiles to complete the job," and that his reason for the misrepresentation was to get them to pay more money to him, which they did. Their evidence that this statement was false is also inadequate. They say "his lie" was proven false in two ways. First, "the day

11

after [the Debtor] was terminated, he left the open package of tiles at [the Levitskys'] property." And, second, he said on March 29, 2012 that the tiles were "his carrot." As to the first assertion, that delivery of the tiles on March 29 proved the statement was false, the Debtor credibly explained at trial that he needed to order an additional box of tiles after the Levitskys changed the bathroom job, that he did not have the money from the Levitskys to pay for the tiles that were only sold in larger boxes, and that after he was terminated he had to pick up the tiles at the supplier because he had ordered them. He was hoping to receive the requisitioned cash from the bank in order to purchase the tiles, which were a punch list item and not needed to get a certificate of occupancy. When he was terminated he paid for the tiles with his own money and dropped them off at the Levitsky home so that they could complete the project. As to the second assertion, that the Debtor told them that the tiles were his "carrot," Mr. Levitsky testified that those words were said and the Debtor denied it. Mrs. Levitsky did not testify, so she did not corroborate her husband's testimony. And the Debtor provided detailed testimony about the events of March 29, 2012 and was more credible. Moreover, the tiles were not needed for a certificate of occupancy and would simply not have provided the leverage attributed to them by the Levitskys. And as to any other work that was started but not completed, the Debtor credibly testified that the work was to be completed, but he was terminated while still awaiting the final $68,000 payment from the bank. The arbitrator awarded the Levitskys breach of contract damages for the unfinished work, but she never found that the Debtor misused the incomplete work in order extract further payments from the Levitskys, and they did not prove such misuse at the trial in this case.

The Levitskys argue that the Debtor's statements to them that he could not afford to pay for materials and subcontractors because of bank delays was untrue. They say that the Debtor's receipt of a $30,000 down payment, together with "other advanced funds," prove that his statement in this regard was untrue. But nothing in the Construction Agreement required the Debtor to use the funds paid to him under the agreement for the project. Once paid to him, the money belonged to the Debtor. He was

12

not required to escrow the money under the contract. The Levitskys have offered no evidence that the Debtor promised to use the payments for use on the project. Absent such a promise, either in the Construction Agreement or in other statements, the Levitskys have no basis to obtain a finding of fraud. The Levitskys have offered no evidence that the Debtor promised to use the payments on the project. *See Oriel v. Alexander (In re Alexander)*, 2012 WL 2994840, *14-16 (Bankr. D. Mass. 2012).

      Finally, the Levitskys argue that the Debtor falsely represented that he would honor the $43,000 "repayment checks." In fact, the Debtor testified that at the time he wrote the checks, he intended to honor them. The purpose of the checks was that the final $68,000 in requisitions was delayed and it appears that it would not be paid until a certificate of occupancy was obtained. In order to keep the project moving, the Levitskys advanced $48,000 to the Debtor and, because the Levitskys were afraid the Debtor might be paid the requisitioned $68,000 and not repay them for the advances, the Debtor wrote $48,000 in checks back to the Levitskys to be held until the $68,000 arrived. The Debtor testified that he spent the $48,000 on the project. According to the Debtor, the $68,000 was never paid to him, but Mrs. Levitsky asked if she could deposit $5,000 of the help funds for a tuition payment, and the Debtor agreed. That check was honored. Later, she deposited two more checks without his approval, and those checks were dishonored. I find the Debtor credible in his description of these facts. And in any event there is no evidence that the Debtor did not intend for the checks to be honored when presented after he received the $68,000 from the bank. A dishonored check, on its own, does not constitute fraud under § 523. *Williams v. United States*, 458 U.S. 279, 284-85 (1982) (a check is not a factual representation); *Groetken v. Davis (In re Davis)*, 246 B.R. 646, 653 (BAP 10th Cir. 2000) (debtor did not make a statement by presenting a check, and a dishonored check is actual fraud only where there is evidence that the debtor did not intend for the check to be paid); *In re Degraffenreid*, 131 B.R. 178, 180 (Bankr. N.D. Okla. 1991) (same). I am aware of no evidence that the Debtor ever received the final $68,000 triggering the predicate for the $43,000 in checks to be cashed. There is evidence that the

Levitskys refinanced the mortgage with a different lender and were expecting to receive $70,000 after the certificate of occupancy was issued, but this happened after the Debtor was terminated.

**B.    11 U.S.C. § 523(a)(4)**

    **i.    Applicable Law**

Section 523(a)(4) of the Bankruptcy Code excepts from discharge any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4). To except a debt from discharge under § 523(a)(4), a creditor must establish that the debtor acted as the fiduciary in a fiduciary relationship and that his or her conduct in that capacity constituted a defalcation. *Reiss v. McQuillin (In re McQuillin)*, 509 B.R. 773, 787-88 (Bankr. D. Mass. 2014). Federal law determines whether a fiduciary relationship exists under § 523(a)(4). *Raso v. Fahey* (*In re Fahey*), 482 B.R. 678, 688 (1st Cir. BAP 2012); *In re McBride*, 512 B.R. 103, 113 (Bankr. D. Mass. 2014). The "broad definition of fiduciary under nonbankruptcy law—a relationship involving trust, confidence, and good faith—is inapplicable in the nondischargeability context." *Fahey*, 482 B.R. at 688, quoting *Honkanen v. Hopper* (*In re Honkanen*), 446 B.R. 373, 378–79 (9th Cir. BAP 2011). Under federal law, a fiduciary relationship arises by virtue of an express or technical trust. *Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 333, 55 S.Ct. 151, 79 L.Ed. 393 (1934); *Rutanen v. Baylis (In re Baylis)*, 313 F.3d 9, 17 n.3 (1st Cir. 2002). "The elements of an express trust have traditionally included an explicit declaration of trust, a clearly defined trust res, and an intent to create a trust relationship." *Fahey,* 482 B.R. at 687. "A technical trust is one that arises under statute or common law." *Petrucelli v. D'Abrosca* (*In re D'Abrosca*), 2011 WL 4592338, at *5 (1st Cir. BAP Aug. 10, 2011); *M–R Sullivan Mfg. Co., Inc. (In re Sullivan)*, 217 B.R. 670, 675 (Bankr. D. Mass. 1998).

      ii.        **Discussion**

           a.        **Defalcation While Acting in a Fiduciary Capacity**

The Levitskys argue that "by accepting $48,000 from the Levitskys, [the Debtor] became a fiduciary and owed a duty to the Levitskys to dispose of these assets as agreed." They allege that the existence of an escrow agreement between themselves and the Debtor gives rise to a technical trust under Massachusetts law, creating the type of fiduciary obligation encompassed by section 523(a)(4). I agree with the Levitskys that an escrow agreement need not be reduced to writing. It may be an oral agreement between the parties. *Zang v. NRT New England, Inc.*, 77 Mass. App. Ct. 665, 933 N.E.2d 694, 698 (2010).

But I find that there was no escrow agreement here, oral or otherwise. An escrow agreement is one pursuant to which an escrow agent is to hold documents or, as in this instance, funds pending satisfaction of a condition. *Matthews v. Nealon (In re Nealon)*, 532 B.R. 412, 423 (Bankr. D. Mass. 2015). Here, there was no agreement that the Debtor would hold money. The Levitskys advanced money to him because he needed the money, the liquidity, to expedite his work on the contract. They knew and in fact intended that he would use it. These were in essence short-term loans, each subject to an obligation to repay upon his receipt of certain disbursements from the bank. His obligation to repay was not an obligation to return to the Levitskys the very same monies they had advanced to him. There simply was no obligation to hold monies, no arrangement under which the Debtor can be said to have held certain monies as a trustee or fiduciary. The Debtor never acted in a fiduciary capacity within the meaning of § 523(a)(4).

Even if an escrow was created, there is no evidence that the event requiring the payment of the funds out of escrow—the payment of $68,000 to the Debtor—ever occurred. For the same reason the Levitskys have not established that they had the right to deposit the two checks that were dishonored.

For these reasons, the Levitskys have not established cause to deny the Debtor a discharge under the fiduciary language of § 523(a)(4).

### b. Embezzlement or Larceny

Relying on the other grounds for denial of discharge under § 523(a)(4), the Levitskys allege that the Debtor either embezzled or stole the $43,000. Embezzlement under section 523(a)(4) "is the fraudulent conversion of property of another by one who is already in possession of it." *Sherman v. Potapov (In re Sherman)*, 603 F.3d 11, 13 (1st Cir. 2010). "Embezzlement accordingly requires proof that (i) property in the perpetrator's lawful possession but (ii) belonging to another (iii) was appropriated by the perpetrator in a manner inconsistent with the property rights of the other and the scope of his or her authorization to deal with the property (iv) with fraudulent intent." *Reiss v. McQuillin (In re McQuillin)*, 509 B.R. 773, 785 (Bankr. D. Mass. 2014). Again, the Levitskys miss the mark. First, it is uncontested that the $43,000 was given to the Debtor and used on the project, precisely as they mutually intended. Second, the Debtor testified, and I find, that he intended to repay the $43,000 to the Levitskys when he received the $68,000 from the bank, which I have no evidence that he ever received. There was no embezzlement.

The Levitskys argue that the Debtor committed larceny as to the $43,000, as that term is used in § 523(a)(4). "What constitutes larceny for purposes of § 523(a)(4) is a question of federal law. Under federal law, larceny is 'the (1) wrongful taking of (2) property (3) of another (4) without the owner's consent (5) with intent to convert the property.' When the owner of property has consented to its taking, the owner cannot use the common law theory of larceny by fraud or trick to prevail under § 523(a)(4)." *Faria v. Silva (In re Silva)*, 2014 WL 217889 at *9 (Bankr. D. Mass. 2014) (quoting *Adamo v. Scheller (In re Scheller)*, 265 B.R. 39, 53 (Bankr. S.D.N.Y. 2001)). The Levitskys gave the $43,000 to the Debtor so that he could continue the building project on their home. The Debtor in fact did continue the project, and he used the $43,000 for that purpose. There was no wrongful taking of the monies; they

16

were advanced to him voluntarily—and indeed used precisely as the parties mutually intended. There was no larceny.

**C.    11 U.S.C. § 523(a)(6)**

    **i.    Applicable Law**

Debts of the kind specified in § 523(a)(6) are not excepted from the ordinary chapter 13 discharge, issued under § 1328(a), but are excepted from chapter 13's so-called "hardship discharge," issued under § 1328(b), and from a chapter 7 discharge, issued under § 727(a). 11 U.S.C. § 1328(a) (omitting debts of the kind specified in § 523(a)(6) from list of debts excepted from discharge issued under § 1328(a)); 11 U.S.C. § 1328(c) (excepting any debt of a kind specified in § 523(a) from discharge issued under § 1328(b)); and 11 U.S.C. § 727(b) (excepting any debt of a kind specified in § 523(a) from discharge issued under § 727(a)).

Section 523(a)(6) excepts from discharge any debt for "willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). It requires injury to another "entity," which is a defined term that includes a person, 11 U.S.C. § 101(15), or to "the property of another entity." The injury must be both willful and malicious. "Willfulness" requires a showing of intent to injure or at least of intent to do an act which the debtor is substantially certain will lead to the injury in question. *Kawaauhau v. Geiger*, 523 U.S. 57 (1998). "Malicious" requires the injury to have been "wrongful," "without just cause or excuse," and "committed in conscious disregard of one's duties." *Printy v. Dean Witter Reynolds, Inc.*, 110 F.3d 853, 850 (1st Cir. 1997). Malice thus has both objective and subjective elements: the injury must have been objectively wrongful or lacking in just cause or excuse; and the debtor must have inflicted the injury in "conscious disregard" of duty, meaning with awareness that the act was wrongful or lacking in just cause or excuse. *Burke v. Neronha (In re Neronha)*, 344 B.R. 229, 231-32 (Bankr. D. Mass. 2006). "An injury is malicious if it was wrongful and without just cause or excuse, even in the absence of hatred, spite or ill-will." *Old Republic National Title*

17

*Ins. Co. v. Levasseur (In re Levasseur)*, 737 F.3d 814, 818 (1st Cir. 2013) (quoting from *Printy,* 110 F.3d at 859).

Here a judgment for breach of contract is alleged to be non-dischargeable. The law is unsettled as to whether, under what circumstances, and to what extent a debt for breach of contract may be subject to the exception from discharge in § 523(a)(6). Subsection (a)(6) requires "injury . . . to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). Not just any injury will suffice; otherwise, the drafters would not have specified "to another entity or to the property of another entity." While some actions that constitute breaches of particular contracts may *also* be injurious to entities or property, it is not at all clear that a breach of contract is *per se* an injury to an entity or to property. However, it is undisputed that no debt for breach of contract can be excepted from discharge without satisfying the other requirements of subsection (a)(6): that the injury in question, whatever it is, have been both willful and malicious.

  **ii.**  **Discussion**

The Levitsky's count under § 523(a)(6) must be dismissed because debts of the kind specified in § 523(a)(6) are not excepted from the ordinary chapter 13 discharge, issued under § 1328(a), which is what the Debtor is currently on track to receive. However, the Debtor may yet apply instead for a chapter 13 hardship discharge under § 1328(b) or convert his case to one under chapter 7 and obtain a discharge under § 727(a), and a discharge under either § 1328(b) or §727(a) would be subject to the §523(a)(6) exception. For these reasons, and because the parties have already litigated the § 523(a)(6) issues, I will address them at this time, to avoid a possible need to relitigate this count later.

The Debtor's breaches of contract here do not satisfy the requirements that the injury have been willful and malicious. The Levitskys contend that the arbitrator's entire award constitutes injury that § 523(a)(6) would except from discharge. The award arises from three distinct categories of injurious action: the Debtors failures to complete tasks that he was by contract required to complete;

the Debtors failures to repay $43,000 in short-term loans from the Levitskys; and the Debtor's dishonor of two checks. The Plaintiffs do not indicate whether, much less explain why, these are injuries to them as persons or to their property. I need not decide whether the injuries complained of are injuries "to an entity" or "to the property of an entity" within the meaning of § 523(a)(6) because these injuries were neither willful nor malicious.

First, I have already found that the Debtor did not intentionally fail to finish the work that the contract required, either as a lever to extract more money from the Levitskys or for any other reason. His failure to complete the work was not intentional, much less malicious.

Second, the Levitskys argue that the Debtor intentionally injured them when he failed to repay the $43,000 in checks they had given him to advance the construction costs. They argue that the dishonor of two checks is evidence of malicious intent. The facts do not bear this out. The intent behind the exchange of checks was to ensure that the Debtor was not paid twice: once by the Levitskys and once by the bank. It is uncontested that the $43,000 he is alleged to have taken was used to purchase materials and labor for the construction project; this is precisely the purpose for which it was advanced. The trigger for repayment of the $43,000 was to be the payment of the final $68,000 from the bank to the Debtor. But there is no evidence that he ever received the final $68,000 from the bank. Indeed, he denies that he did. Because the Debtor was never paid the final $68,000 by the bank, the requirement to pay the $43,000 never arose.

Third, the dishonor of the two checks, which gave rise to separate damages of $200, was neither intentional nor malicious. The arbitrator found a violation of Mass. Gen. Laws ch. 93, § 40A on account of the two dishonored checks, but that statute is a strict liability statute that requires no showing of intent whatsoever. The Debtor's checks were indeed dishonored, and he failed to cure that dishonor within 30 days of demand. But Mrs. Levitsky deposited the checks without the Debtor's permission and before the occurrence of the condition for their deposit. Moreover, the Debtor had no money with which to honor

the checks—that is why his receipt of payment from the bank was a condition of the Levitsky's depositing the checks—so the dishonor was not intentional; the Debtor was incapable of honoring the checks. The injury was thus far from intentional, wrongful, or unjustified.

**Conclusion**

For the reasons stated herein, the Levitskys have failed to establish a basis under § 523(a) for excepting their judgment debt from discharge.  A separate judgment shall enter, declaring that the judgment debt is not excepted from discharge.

Date:  January 17, 2017

_____
Frank J. Bailey
United States Bankruptcy Judge